**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| U.S. INFORMATION SYSTEMS, INC., | Civil Action No.: 08-1125 (JLL) |
| Plaintiff, | |
| v. | |
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION NUMBER 164, ALF-CIO, | **OPINION** |
| Defendant. | |

| |
|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NUMBER 164, AFL-CIO, |
| Third-Party Plaintiff, |
| v. |
| GALE CONSTRUCTION COMPANY, ERNST & YOUNG LLP, PREFERRED COMMUNICATION TECHNOLOGIES, |
| Third-Party Defendants. |

**LINARES**, District Judge.

## <u>INTRODUCTION</u>

This matter arises out of a picket line by Defendant Local 164 at the site of an Ernst & Young, LLP Project (the "Project") in August 2007. Plaintiff claims that Local 164's intent in erecting the picket line was to encourage employees working for other trades to refuse to perform services on the Project in order to force Third-Party Defendant Preferred Communication

1

Technologies ("PCT") to cease doing business with the Plaintiff.  (Compl., ¶ 20).  According to Plaintiff, such actions established a secondary boycott in violation of §§ 8(b)(4)(i)(B) and 8(b)(4)(i)(D) of the National Labor Relations Act ("NLRA"), codified at 29 U.S.C. §§ 158(b)(4)(i)(B) and (D).  Defendant, on the other hand, claims that its objective was merely to publicize Plaintiff's substandard wages and to put pressure on the Plaintiff to comply with the area standard.  The use of a picket line to pursue such objectives is, according to Local 164, a lawful, protected activity.

Currently before the Court are three motions for summary judgment filed by Plaintiff, Defendant and Third-Party Defendant PCT, respectively.  The Court has considered the submissions made in support of and in opposition to the instant motions.[1]  No oral argument was heard.  Fed. R. Civ. P. 78.  Based on the reasons that follow, Plaintiff's motion is granted in part and denied in part, Local 164's motion is granted in part and denied in part, and Third-Party Defendant's motion is granted.

## LEGAL STANDARD

A court shall grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.  56(c). The moving party first must show that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. Id. at 324. The non-moving party must offer specific facts that

---

[1]  This Court's jurisdiction is premised on 29 U.S.C. § 187(b) and 28 U.S.C. § 1331.

establish a genuine issue of material fact and may not simply rely on unsupported assertions, bare allegations, or speculation. See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). Also, the Court must consider all facts presented and the reasonable inferences drawn from them in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

## DISCUSSION

### I.    Plaintiff's Motion

Plaintiff's Complaint sets forth the following claims for relief: (1) secondary boycott in violation of 29 U.S.C. §§ 158(b)(4)(i)(B) and (D), (2) tortious interference with a contract, and (3) tortious interference with a prospective economic advantage.   In addition, Plaintiff seeks injunctive relief with respect to its secondary boycott claim.   Plaintiff moves for summary judgment as to all claims except violation of 29 U.S.C. § 158(b)(4)(i)(D).[2]

#### A.    Factual Background

The following facts are undisputed unless otherwise noted.   Plaintiff, U.S. Information Systems, Inc. ("Systems"), is a contractor that provides technology installation services.   (Pl. 56.1 Stmt., ¶ 1; Def. Responsive Stmt., ¶ 1).   In providing such services, Plaintiff utilizes technicians affiliated with the Communications Workers of America, AFL-CIO (CWA), Local 1106. Id. Defendant, International Brotherhood of Electrical Workers Local Union No. 164, AFL-CIO ("Local

---

[2] The Court notes that Count One of Plaintiff's Complaint alleges violation of two sections of the statute, namely, violation of 29 U.S.C. § 158(b)(4)(i)(B) and 29 U.S.C. § 158(b)(4)(i)(D). Defendant has construed Count One as alleging two separate claims: (1) secondary boycott claim pursuant to 29 U.S.C. § 158(b)(4)(i)(B), and (2) jurisdictional picketing claim pursuant to 29 U.S.C. § 158(b)(4)(i)(D).   Plaintiff has provided the Court with no reason to construe it otherwise.

164") is a labor organization representing electricians. (Pl. 56.1 Stmt., ¶ 11; Def. Responsive Stmt.,

¶ 11).

Plaintiff and contractors of Local 164 are competing entities. (Pl. 56.1 Stmt., ¶ 16; Def.

Responsive Stmt., ¶ 16).  Plaintiff claims that its costs are significantly less than those of Local 164

for a variety of reasons including, but not limited to, the fact that its labor is more productive and its

ability to purchase its materials at a better price. (Pl. 56.1 Stmt., ¶ 15).

In early 2007, Ernst & Young sent out a request for proposals for a project located at 200

Plaza Drive in Secaucus, New Jersey.  (Pl. 56.1 Stmt., ¶ 36; Def. Responsive Stmt., ¶ 36).  Third-

Party Defendant PCT and Star-Lo Communications, a contractor affiliated with Local 164, were

among the contractors bidding on the Project.  (Pl. 56.1 Stmt., ¶¶ 39, 44-46; Def. Responsive Stmt.,

¶¶ 39, 44-46).  PCT ultimately obtained the telecommunications work on the Project after being the

lowest bidder.  (Pl. 56.1 Stmt., ¶¶ 39, 46; Def. Responsive Stmt., ¶¶ 39, 46).  PCT then subcontracted

the installation of the telecommunications equipment to the Plaintiff. (Pl. 56.1 Stmt., ¶ 41; Def.

Responsive Stmt., ¶ 41). Plaintiff, in turn, utilized technicians employed by U.S. Information

Services, Inc. ("Services") to work on the Project. (Pl. 56.1 Stmt., ¶ 49; Def. Responsive Stmt., ¶ 49).

Services is a party to a CBA with Local 1106 of the CWA, a recognized labor organization affiliated

with the AFL-CIO. (Pl. 56.1 Stmt., ¶ 50; Def. Repsonsive Stmt., ¶ 50).

On August 16, 2007, Local 164 placed a picket at the site of the Ernst & Young Project. (Pl.

56.1 Stmt., ¶ 51; Def. Responsive Stmt., ¶ 51).  No union members crossed the picket line. (Pl. 56.1

Stmt., ¶ 103; Def. Responsive Stmt., ¶ 103).  As a result, the Ernst & Young Project was shut down.

(Pl. 56.1 Stmt., ¶ 104; Def. Responsive Stmt., ¶ 104).  Local 164 contends that its purpose in

picketing was to publicize Plaintiff's substandard wages and to put pressure on the Plaintiff to

4

comply with the area standard.  (Def. Opp'n Br. at 1-2).  Plaintiff, on the other hand, contends that Local 164's true intent in picketing was ultimately to obtain the Ernst & Young telecommunications project for one of its own signatory contractors.  (Pl. Br. at 26).  In particular, Plaintiff maintains that Local 164's intent in erecting the picket line was to encourage employees working for other trades to refuse to perform services on the Project in order to force PCT to cease doing business with the Plaintiff.  (Compl., ¶ 20).

As a result of the picket, James Zappala of PCT terminated PCT's agreement with Plaintiff. (Pl. 56.1 Stmt., ¶ 135; Def. Responsive Stmt., ¶ 135). In a letter written by Zappala to Plaintiff, he stated: "Ernst & Young would have had no reason to request replacing [plaintiff] if [there] had not been a picket put up by Local 164.  It was entirely set in motion by the picket." (Pl. 56.1 Stmt., ¶ 138; Def. Responsive Stmt., ¶ 138).  Star-Lo Communications, a contractor affiliated with Local 164, replaced Plaintiff on the Ernst & Young Project. (Pl. 56.1 Stmt., ¶ 149; Def. Responsive Stmt., ¶ 149).

Plaintiff now moves for summary judgment on the basis that Local 164's picket was unlawful secondary activity pursuant to § 8(b)(4)(i)(B) of the NLRA, and that its actions constitute tortious interference under New Jersey law.  Local 164 opposes Plaintiff's motion on the basis that its actions are protected primary activity under the NLRA and that any state law claims of tortious interference are preempted by § 303 of the Labor Management Relations Act.

### B.  Analysis

Section 303(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187(a), makes it is unlawful for a union to engage in any activity defined as an unfair labor practice in section 8(b)(4) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4).   29 U.S.C.

§ 187(a).   Subsection (b), in turn, gives individuals injured in business or property, by virtue of a violation of subsection (a), a right of action for damages sustained and the cost of the suit. 29 U.S.C. § 187(b).

Subsection (b) of section 8 of the NLRA, 29 U.S.C. § 158(b), defines certain actions by labor organizations or their agents as unfair labor practices.  29 U.S.C. § 158(b).[3]  Plaintiff claims that

---

[3] Subsection (b) provides, in relevant part:

> It shall be an unfair labor practice for a labor organization or its agents . . . (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services . . . where . . . an object thereof is –
>
> * * *
>
> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title:  Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;
>
> * * *
>
> (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.

Local 164's actions constitute an unfair labor practice pursuant to subsections (b)(4)(i)(B) (by engaging in a secondary boycott) and (b)(4)(i)(D) (by engaging in a jurisdictional picket).[4]  Plaintiff now moves for summary judgment solely as to subsection (b)(4)(i)(B).

### 1.    Secondary Activity – 29 U.S.C. § 158(b)(4)(i)(B)

29 U.S.C. § 158(b)(4)(i)(B) prohibits any labor organization from inducing or encouraging any person employed by a neutral employer to strike or refuse to work. See George v. Nat'l Ass'n of Letter Carriers, 185 F.3d 380, 388 (5th Cir. 1999). Secondary boycotting and secondary picketing have been construed as unfair labor practices pursuant to subsection (b)(4) of the NLRA, 29 U.S.C. § 158(b). See, e.g., Landgrebe Motor Transport, Inc. v. District 72, Intern. Ass'n of Machinists & Aerospace, 763 F.2d 241, 244 (7th Cir. 1985) (citing  NLRB v. Int'l Longshoremen's Assoc., 447 U.S. 490, 504-05 (1980)).  Secondary boycotting occurs where "the union applies economic pressure to a person with whom the union has no dispute regarding its own terms of employment in order to induce that person to cease doing business with, and thereby increase the pressure on, another employer, called the primary employer, with whom the union does have such a dispute." Landgrebe Motor Transport, Inc., 763 F.2d at 244.   The theory underlying the prohibition against secondary boycotts is to "shield unoffending employers from pressures in disputes not their own, though preserving the rights of unions to bring pressure to bear on offending employers in primary labor disputes."  Taylor Milk Co. v. Int'l Bhd. of Teamsters, 248 F.3d 239, 244-45 (3d Cir.2001).  As applied to the facts at hand, Plaintiff maintains that Local 164's intent in erecting the picket line was

---

[4]  29 U.S.C. § 158(b)(4)(ii) prohibits threats, coercion, or restraint in the pursuit of certain ends.  See generally George v. Nat'l Ass'n of Letter Carriers, 185 F.3d at 388.  To the extent Plaintiff now claims that Local 164's use of "target funds" violates subsection (b)(4)(ii), no such claim was set forth in Plaintiff's Complaint and no formal motion to amend the Complaint to add such claim has been filed.  Accordingly, no such claim is properly before this Court.

to encourage employees of Star-Lo Electric "to refuse to perform services on the Project with the same purpose and object of forcing and requiring PCT to cease doing business with" the Plaintiff. (Compl., ¶ 20).

Subsection (b)(4) <u>exempts</u> from its prohibition, however, primary activity.[5]  <u>See</u> 29 U.S.C. § 158(b)(4); <u>Landgrebe Motor Transport</u>, 763 F.2d at 245.  Primary strikes or picketing are those which are directed against the employer with whom the union has the dispute concerning terms of employment. <u>Id.</u>  Such activity is permissible.  As applied to the facts at hand, Defendant maintains that its objective in erecting the picket line was merely to publicize Plaintiff's substandard wages and to put pressure on the <u>Plaintiff</u> to comply with the area standard.

In order to establish the presence of § 158(b)(4)(i)(B) conduct, Plaintiff need not demonstrate an <u>express</u> inducement to strike; rather, it is sufficient for Plaintiff to show that Local 164's conduct would be "reasonably understood as 'a signal or request' " that neutral employees engage in a work stoppage against PCT, <u>Teamsters Local Union No. 122 (August A. Busch & Co.)</u>, 334 N.L.R.B. 1190, 1192 (2001), or that it possessed a secondary motive in engaging in primary activity, <u>Local 294, Teamsters (Rexford Sand & Gravel Co.)</u>, 195 N.L.R.B. 378, 382 (1972).

---

[5] In particular, the last clause of section 8(b)(4) provides that "nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution." 29 U.S.C. § 158(b)(4).

<u>Area Standards</u>

"The maintenance of the compensation rate in a geographic area is a legitimate focus of union activity." <u>Sachs v. Plumbers Local Union No. 5</u>, 307 F. Supp. 190, 194 (D.D.C. 1969).   In this regard, a union has a right to protest the payment of substandard wages through area standard picketing even if it results in a work stoppage.[6]  <u>See, e.g.</u>, <u>United Brotherhood of Carpenters, Local 480</u>, 209 N.L.R.B. 921, 922 (1974), 1974 WL 4801.  "[A]rea standards picketing is permissible only where it can be shown that the employer's mode of operation is substandard in comparison with the negotiated area standards." <u>N.L.R.B. v. Bldg. and Const. Trades Council of Delaware</u>, 578 F.2d 55, 58 (3d Cir. 1978) (citing <u>Automotive Employees, Laundry Drivers, Local 88 (West Coast Cycle Supply Co.)</u>, 208 N.L.R.B. No. 97 (1974)).  This means that "there must have been an investigation and an evaluation of comparative standards carried out with as great a degree of thoroughness as the circumstances will permit." <u>Sales Delivery Drivers, Warehousemen and Helpers Local 296 and Food Employers Council, Inc.</u>,  205 N.L.R.B. 462, 471 (1973).

Since "it is 'the duty of a union that seeks to engage in lawful area standards picketing' to investigate wages and conditions alleged to be substandard, the union has the burden of 'coming forward with credible evidence' that establishes both the area standards and the claimed disparity." <u>N.L.R.B. v. Great Scot, Inc.</u>, 39 F.3d 678, 684 (6th Cir. 1994) (internal quotations omitted).  Thus, the union has a "heavy burden" in supporting its contention that its only purpose in picketing was

_____

[6] Plaintiff makes the argument that area standards picketing cannot be utilized by a union to protest against another union; rather, Plaintiff maintains that area standards picketing was intended to be utilized by unions to protest against <u>non-union</u> employers paying substandard wages.  The Court notes that most, if not all, of the cases cited to by the parties involving area standards picketing involve a union protesting against a non-union employer.  In any event, because the Court finds that Local 164 failed to conduct an adequate investigation into its claim of substandard wages, the Court need not reach the issue of whether area standards picketing is permissible (and protected) primary activity where it is aimed against a competing employer affiliated with a different union.

9

to protest Plaintiff's alleged substandard wages.  See id. at 683.  In order to meet this burden, it must establish that  "its claims of substandard wages and benefits are made in good faith and are based on actual knowledge gleaned from sufficient investigation  of conditions existing at the time the picketing is initiated against the targeted employer."  Id.   A union's failure to make a bona fide attempt to determine that the employer's labor costs are, in fact, substandard constitutes evidence that the picketing has a proscribed recognitional object.[7]  Operating Engineers Local 101 (St. Louis Bridge), 297 N.L.R.B. 485, 491 (1989).  Thus, as a preliminary matter, the Court must determine whether Local 164 has met its burden in demonstrating that its claim of substandard wages was sufficiently supported at the time the picketing occurred.  Based on the reasons that follow, the Court finds that it was not.

Plaintiff claims that "Local 164 made no attempts whatsoever to obtain accurate information regarding the wages and benefits paid by the subcontractor utilized by plaintiff." (Pl. 56.1 Stmt., ¶ 152).   Local 164, on the other hand, maintains that it decided to stage an area standards picket because of its familiarity with Plaintiff and based on industry knowledge regarding Plaintiff's alleged substandard wages.  (Def. Opp'n Br. at 13). Both parties rely on the deposition testimony of Keith Misciagna, a business agent of Local 164, in support of their respective positions. (Pl. Ex. 3).  The Court has closely reviewed the evidence contained in the record in this matter, with particular

---

[7] "'It is not necessary to find that the sole object of the strike' was secondary so long as one of the union's objectives was to influence another employer by inducing the struck employer to cease doing business with that other employer." N. L. R. B. v. Enterprise Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Mach. and General Pipefitters of New York and Vicinity, Local Union No. 638, 429 U.S. 507, 531 (1977).  The question of picketing objectives is one of fact to be determined by the finder of fact. See N.L.R.B. v. Int'l Bhd. of Elec. Workers, Local 265, 604 F.2d 1091, 1097 -1098 (8th Cir. 1979). In doing so, the finder of fact "may consider the totality of the union conduct" and is "not bound to accept the self-serving explanation given by the union as to the object of its actions." Id.

10

attention given to the deposition transcript of Keith Miscianga.[8]  Misciagna states, in pertinent part, the following:

- He did not know that Plaintiff had subcontracted its work to Services. (Misciagna Tr. at 186:6).

- He had obtained his information regarding the rates of pay utilized by the CWA based upon "industry knowledge." (Misciagna Tr. at 37:5).

- His information regarding rates of pay utilized by CWA was also obtained through discussions with certain CWA contractors, including, but not limited to, Brian Lennen and Eric Seivertsen.

- Mr. Lennen gave him specific information related to the rates of pay. (Misciagna Tr. at 39:2-5).  However, Misciagna also admitted that he could no longer recall such specifics (Id. at 39:13) and that he could only recall Mr. Lennen disclosing to him that the wage rates were "significantly less," and not the specific amounts per se (Misciagna Tr. at 41:14-21).  Misciagna also stated that he was unaware of whether or not Mr. Lennen himself had ever seen Plaintiff's CBA.  (Misciagna Tr. at 40:1-5) ("I don't know exactly if he did.  He led me to believe he knew about it.").

- Eric Seivertsen from the National Electrical Contractors Association told him that there was a "significant difference" between Plaintiff's rates and its competitors and that Plaintiff, therefore, had "an unfair economic advantage" (Misciagna Tr. at 43:8-14).

---

[8] Analysis of the union's conduct "involves difficult factual determinations." Abreen Corp. v. Laborers' Int'l Union, N.A., AFL, AFL-CIO, 709 F.2d 748, 755 (5th Cir. 1983).

- Misciagna admitted, however, that Seivertsen did not disclose to him any specifics as to what was contained in Plaintiff's CBA or Plaintiff's actual rates of pay. (Id. at 43:15-22).

- Of the other individuals from whom Misciagna allegedly obtained information regarding Plaintiff's rates of pay, Misciagna admits that he was unaware of the source upon which those individuals relied.  (Misciagna Tr. at 46:5-13) ("They all said they had knowledge.  How they have that knowledge, I don't know."); (Id. at 56:13-18)  ("Rich Imperato told me that he had specifically had information . . . regarding USIS's manning, so whether it's a CBA or another document, I'm not sure . . . .").

- Local 164 representatives first received a copy of the CBA between Services and Local 1106 of the CWA on August 21, 2009 – two years after it engaged in the picket at issue. (Misciagna Cert., ¶ 3, Pl. Ex. 17).  No one associated with Local 164 had seen the CBA before that date, (Misciagna Tr. at 73:2-11).

- He could have obtained a copy of the Services' CBA prior to that time if he had made the effort.  (Id. at 74:24-75:4) ("In my opinion we could have got it at any time if we really made an effort, but we never made an effort.").  If offered a copy of the CBA prior to commencement of this lawsuit, Misciagna testified that he may not have asked to have the document. (Id. at 134:7-135:2) ("Q: What you're saying is you might not have asked to have the actual document even if you had had the opportunity, correct? A: I may not

have.  I may have but I can't say for sure.").  Once he <u>did</u> make the effort –
after commencement of this lawsuit – he was able to obtain it relatively
quickly. (<u>Id.</u> at 75:14-76:8) ("So when we were told that we couldn't see the
one Collective Bargaining Agreement, we thought we would see if we could
get one from outside of this form. . . . Got it pretty quick, couple days, couple
weeks maybe.").

- Prior to the picket, no one from Local 164 had attempted to contact Plaintiff
to discuss the issue of their alleged substandard wages. (<u>Id.</u> at 127:24-128:7).
("We already felt we knew what their rates were. . . . We didn't know how
to contact them. We didn't make an effort to because we felt that we already
knew that there was a difference." Stephen Clay, another business agent of
Local 164, provided similar testimony. (Clay Tr. at 34:12-15, Pl. Ex. 6) ("Q:
Do you know anyone at Local 164 who spoke to any of those entities, either
U.S. Information Systems, U.S. Information Services or Local 1106 of the
CWA prior to the picket being placed to determine what wages were being
paid? . . .  A: Personally, no.").

Such testimony demonstrates – unequivocally – that Local 164's claim of substandard wages
was not based on actual knowledge and its investigation of such was cursory at best.  Any suspicions
it may have had regarding Plaintiff's alleged substandard wages – to the extent such suspicions
existed – were entirely ubsubstantiated.   If Local 164 had been trying to ascertain whether Plaintiff
was, <u>in fact</u>, paying substandard wages, Misciagna's testimony confirms that it could have easily

obtained a copy of the relevant CBA.  In addition, Local 164 could have attempted to contact Plaintiff directly prior to erecting the picket.  Local 164's failure to make such obvious efforts to substantiate its claim of substandard wages calls into question its true object.  More importantly, in failing to make such efforts, Local 164's actions fall short of those required for properly asserting a claim of substandard wages.  See Sales Delivery Drivers, Warehousemen and Helpers Local 296 and Food Employers Council, Inc., 205 N.L.R.B. at 471 ("Area standards picketing can only be justified where . . . [there has been] an investigation and an evaluation of comparative standards carried out with as great a degree of thoroughness as the circumstances will permit."); see also N.L.R.B. v. Int'l Union of Operating Engineers, Local 571, 624 F.2d 846, 849 (8th Cir. 1980) (noting that union's claim of area-standard picketing cannot be sustained where there is "no evidence showing a bona fide attempt by Local 571 to determine if the Company was paying less than the area standards wage before beginning the[ir] picketing...."); Carpenters Local Union No. 1622 and Paul E. Iacono Structural Engineers, Inc., 250 NLRB 416 (1980) (finding that union's basis for picketing "cannot be characterized as 'a bona fide attempt' . . . to determine that, in fact, the Employer's costs were substandard, which is the duty of a union that seeks to engage in lawful area standards picketing").

In light of the foregoing, the Court finds that Local 164 has not established that it made a bona fide attempt to determine that Plaintiff's wages were, in fact, substandard.  Such a finding, coupled with evidence presented by the Plaintiff of the circumstances leading up to and surrounding Local 164's August 16, 2007 picket, compels an inference that maintenance of area standards was not its true object.[9]  See Automotive Employees, Laundry Drivers, Local 88 (West Coast Cycle

---

[9] Even if "the union acts with 'mixed motives,' partially primary and partially secondary, its conduct is unlawful under section 8(b)(4)."  Mautz & Oren, Inc. v. Teamsters, Chauffeurs, and

14

Supply Co.), 208 N.L.R.B. 679, 680 (1974) (finding that respondent's picketing was for a recognitional object and noting that its "conduct, together with its demand for irrelevant information, compels an inference that maintenance of area standards was merely a device to evade the provisions of this Act, and not its true object at all."); Sales Delivery Drivers, Local 296, 205 N.L.R.B. at 473 (finding the circumstances at issue "to support an inference that, despite Respondents ostensible announced area standards object and its disclaimer of a recognitional object, the true object of the picketing was to bring the northern California bakery deliveries under the coverage of the Area Agreement" in violation of the statute).

Such circumstances include: (1) Local 164 had attempted to obtain the telecommunications work on the Project for Star-Lo Communications, one of its signatory contractors, before the contract was awarded to PCT (and the Plaintiff) (Pl. 56.1 Stmt., ¶ 44; Def. Responsive Stmt., ¶ 44), (2) in an attempt to secure the telecommunications work on the Project, Local 164 agreed to pay target funds to Star-Lo just prior to the award of the telecommunications work to PCT (and the Plaintiff), (Pl. 56.1 Stmt., ¶ 45; Def. Responsive Stmt., ¶ 45), (3) comments by Local 164 directed to Stephen Trapp, President of Gale Construction Co. (general contractor for Ernst & Young), on the day of the picket regarding Plaintiff's alleged substandard wages, seemed "scripted" and "rehearsed," (Pl. Ex. 20, Trapp Dep. Tr. at 32:20-33:13), (4) at the time of the picket, the technicians utilized by Plaintiff were not directly on the Project site (Pl. Ex. 3, Misciagna Dep. Tr. at 157:9-165:17; Pl. Ex. 6, Clay Dep. Tr. at 36:20-40:12), (5) approximately 100 employees – of all trades – refused to cross the picket, (Pl. Ex. 6, Clay Dep. Tr. at 56:16-22;  57:5-9), (6) as a result of the picket, the Project stopped (Pl. Ex. 15, Rose Dep. Tr. at 34:5-13), (7) it became clear to Trapp (in the days immediately

---

Helpers Union, Local No. 279, 882 F.2d 1117, 1121 (7th Cir. 1989).

preceding or following the picket) that Star-Lo was attempting, once again, to obtain the telecommunications work on the Project, (Pl. Ex. 20, Trapp Dep. Tr. at 65:1-8; 68:4-15), and (8) Star-Lo ultimately replaced Plaintiff on the Project, (Pl. 56.1 Stmt., ¶ 149; Def. Responsive Stmt., ¶ 149). "[I]t is well settled that it is permissible to rely on circumstantial evidence to establish that a union is responsible for inducing employees to engage in a work stoppage or refuse to process or handle or work on any goods." Local 456, Intern. Broth. of Teamsters, AFL-CIO and Peckham Materials Corp., 307 N.L.R.B. 612, 617 (1992).

It is, therefore, the finding of this Court that Local 164's true object was to force PCT to cease doing business with the Plaintiff in order to obtain the Ernst & Young telecommunications Project for one of its own signatory contractors. Picketing for such a proscribed object constitutes a secondary boycott in violation of 29 U.S.C. § 158(b)(4)(i)(B). Plaintiff's motion for summary judgment as to this claim is, therefore, granted.

### 2.   Tortious Interference

Plaintiff argues that Local 164's actions, in conjunction with those of its signatory contractor, Star-Lo Communications, establish a claim for tortious interference under New Jersey law.[10] In

---

[10] To prove tortious interference with economic advantage under New Jersey law, a plaintiff must show: (1) the plaintiff had a reasonable expectation of an economic benefit or advantage; (2) the defendant knew of plaintiff's expectancy; (3) the defendant intentionally and maliciously interfered with this expectancy; (4) there was a reasonable probability that the plaintiff would have realized the economic benefit in the absence of interference; and (5) the plaintiff suffered injury as a result of the defendant's conduct. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1167 (3d Cir.1991). To prevail on a claim for tortious interference with contractual relations under New Jersey law, a plaintiff must establish:(1) the existence of a contract; (2) that defendant  actually interfered with the contract; (3) that defendant  was not a party to the contract but was rather a third party; (4) that defendant intentionally and maliciously, and hence unreasonably, interfered with the relationship between the contracting parties; (5) that defendant's conduct caused plaintiff damage. See Halebian N.J. v. Roppe Rubber Corp., 718 F. Supp. 348, 360 (D.N.J. 1989). "[T]he difference between tortious interference with prospective contractual relations and tortious interference with performance of a contract is simply the existence of a contract, as opposed to plaintiff's reasonable

particular, Plaintiff argues that "Local 164's intention was to obtain the contract that had already been awarded to PCT and to the plaintiff and, in doing so, to irreparably interfere with the contractual relationship between PCT, the plaintiff and [Ernst & Young]." (Pl. Br. at 46). Plaintiff now moves for summary judgment as to its claim of tortious interference with a contractual relationship.[11]

Local 164 opposes Plaintiff's argument in this regard on the basis that both tortious interference claims are preempted by § 303 of the LMRA, 29 U.S.C. § 187. In support of this position, Local 164 cites to a decision by the Court of Appeals for the Ninth Circuit. Therein, the Court stated – in no uncertain terms – "[t]he interference with prospective economic advantage and contractual rights claims are preempted by section 303 of the LMRA." San Antonio Cmty. Hosp. v. Southern California Dist. Council of Carpenters, 125 F.3d 1230, 1235 (9th Cir. 1997) (citing Local 20, Teamsters, Chauffeurs and Helpers Union v. Morton , 377 U.S. 252, 259-260 (1964) ("If the Ohio law of secondary boycott can be applied to proscribe the same type of conduct which Congress focused upon but did not proscribe when it enacted s 303, the inevitable result would be to frustrate the congressional determination to leave this weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy."); see also Smart v. Local 702 Intern. Broth. of Elec. Workers, 562 F.3d 798, 808 (7th Cir. 2009) ("[W]e hold therefore that section 187(b) completely preempts state-law claims related to secondary boycott activities described in section 158(b)(4); it provides an exclusive federal cause of action for the

---

expectation of an agreement." Coast Cities Truck Sales Inc. v. Navistar Intern. Transp. Co., 912 F. Supp. 747, 772 (D.N.J. 1995).

[11] Plaintiff's Complaint asserts two claims of tortious interference: (1) tortious interference with contractual relationship, and (2) tortious interference with prospective economic advantage. It is unclear whether Plaintiff actually seeks summary judgment as to both claims. The Court need not dwell on this issue inasmuch as the Court finds both claims preempted by § 303 of the LMRA, 29 U.S.C. § 187.

redress of such illegal activity.").

It is clear that the alleged conduct underlying Plaintiff's claims of tortious interference is the same conduct underlying its Section 303(a) claim (which it makes it unlawful for a union to engage in any activity defined as an unfair labor practice pursuant to 29 U.S.C. § 158(b)(4)).  Compare Compl., ¶ 20 (alleging violation of 29 U.S.C. § 158(b)(4)(i)(B)  where "Local 164 induced and encouraged employees of Star-Lo Electric to refuse to perform services on the Project with the same purpose and object of forcing and requiring PCT to cease doing business with Systems.") with Compl., ¶ 27 (alleging claim of tortious interference with contractual relationship where "Local 164 . . . wrongfully, intentionally and with malice interfered with Systems' contract rights and . . . caused PCT to terminate its contract with Systems.").  Plaintiff does not dispute this.  Nor does Plaintiff dispute that the alleged conduct at issue is prohibited by § 303 of the LMRA.  Nevertheless, Plaintiff makes no attempt to address, much less distinguish, the ruling by the Court of Appeals. Accordingly, this Court is bound by the directive set forth by the Court of Appeals for the Ninth Circuit mandating that such state law claims are preempted by § 303 of the LMRA.  See also Point Ruston, LLC v. Pacific Northwest Reg'l Council of the United Broth. of Carpenters and Joiners of Am., 658 F. Supp. 2d 1266, 1277 (W.D. Wash. 2009) (finding plaintiff's contract-based claims completely preempted by § 303 of the LMRA act and noting that "Plaintiffs' contract-based claims in this case seek damages for conduct already prohibited by Section 158(b)(4).").  Plaintiff's motion for summary judgment as to its tortious interference claim(s) is, therefore, denied.  Defendant's cross-motion for summary judgment on such claims is granted.

### 3.    Injunctive Relief

In conjunction with its motion for partial summary judgment, Plaintiff asks the Court, in

passing, to "grant injunctive relief permanently enjoining and restraining Local 164 from engaging in secondary boycott activity as against the plaintiff." (Pl. Br. at 47).  Local 164 opposes Plaintiff's request on the basis that Plaintiff's application is deficient.  (Def. Opp'n Br. at 28).

In deciding whether to grant a permanent injunction, this Court must consider whether: "(1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest." Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001).  The Court agrees that Plaintiff has not made an appropriate application for the injunctive relief it seeks. In particular, Plaintiff has failed to show, inter alia, that it will face irreparable injury in the absence of such restraints.  Plaintiff's application for injunctive relief in connection with its secondary boycott claim is, therefore, denied.

## II.    Defendant's Motion

Local 164 has filed its own motion for summary judgment seeking dismissal of each of Plaintiff's claims, namely: (1) secondary boycott claim (29 U.S.C. § 158(b)(4)(i)(B)), (2) jurisdictional picket claim (29 U.S.C. § 158(b)(4)(i)(D)), and (3) state law tortious interference claims.  Having granted Plaintiff's motion as to its secondary boycott claim, Defendant's motion as to such claim is denied as moot.  Having found Plaintiff's state law tortious interference claims preempted by § 303 of the LMRA, Defendant's motion for summary judgment as to such claims is granted.  Thus, remaining before the Court is Defendant's motion for summary judgment as to Plaintiff's jurisdictional picket claim.

A.      **Jurisdictional Disputes** – 29 U.S.C. § 158(b)(4)(i)(D)

Plaintiff's Complaint alleges that Local 164 engaged in an unlawful jurisdictional picket in

violation of § 158(b)(4)(i)(D) of the NLRA, 29 U.S.C. § 158(b)(4)(i)(D).  Section 158(b)(4)(i)(D)

makes it unlawful for a union to:

> [E]ngage in, or to induce or encourage any individual employed by
> any person engaged in commerce or in an industry affecting
> commerce to engage in, a strike or a refusal in the course of his
> employment to use, manufacture, process, transport, or otherwise
> handle or work on any goods, articles, materials, or commodities or
> to perform any services . . . where . . . an object thereof is . . . forcing
> or requiring any employer to assign particular work to employees in
> a particular labor organization or in a particular trade, craft, or class
> rather than to employees in another labor organization or in another
> trade, craft, or class, unless such employer is failing to conform to an
> order or certification of the Board determining the bargaining
> representative for employees performing such work.

29 U.S.C. § 158(b)(4)(i)(D).   "The essence of a jurisdictional dispute in the § 8(b)(4)(D) . . . sense

is the existence of 'a dispute between two or more groups of employees over which is entitled to do

certain work for an employer.' " Int'l Longshoremen's & Warehousemen's Union, Local 62-B v.

N.L.R.B., 781 F.2d 919, 923 (D.C. Cir. 1986) (quoting N.L.R.B. v. Radio & Television Broadcast

Eng'rs Union, Local 1212, 364 U.S. 573, 579 (1961)).  Such disputes are, in most instances, "of so

little interest to the employer that he seems perfectly willing to assign work to either if the other will

just let him alone." N.L.R.B. v. Radio & Television Broadcast Eng. Union,  364 U.S. 573, 579

(1961).

Plaintiff's Complaint alleges that Local 164 engaged in a picket line with the object of having

the work being performed by Plaintiff reassigned to one of its signatory contractors in violation of

29 U.S.C. § 158(b)(4)(i)(D).  Local 164 now moves for summary judgment as to this claim on the

20

basis that Plaintiff has failed to present evidence in support of said claim.  Plaintiff does not oppose

Defendant's request for dismissal of this claim.  In particular, the Court notes that Plaintiff makes

no effort to engage in any type of legal discussion as to its claim of jurisdictional picketing; rather,

in opposing Defendant's motion, Plaintiff focuses almost entirely on its secondary boycott claim.[12]

Federal Rule of Civil Procedure 56(e) provides, in relevant part:

> When a motion for summary judgment is properly made and
> supported, an opposing party may not rely merely on allegations or
> denials in its own pleading; rather, its response must — by affidavits
> or as otherwise provided in this rule — set out specific facts showing
> a genuine issue for trial. If the opposing party does not so respond,
> summary judgment should, if appropriate, be entered against that
> party.

Fed. R. Civ. P. 56(e).  Plaintiff has failed to properly respond to Defendant's motion as it relates to

Plaintiff's claim that Local 164 violated 29 U.S.C. § 158(b)(4)(i)(D).  Accordingly, Defendant's

motion for summary judgment is granted as to Plaintiff's jurisdictional picketing claim.


**III.    Third-Party Defendant's Motion**

On August 21, 2008, Local 164 filed a Third-Party Complaint against PCT for contribution

pursuant to the  Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -5, and the Comparative

Negligence Act, N.J.S.A. 2A:15-5.1 to 5.17.  In doing so, Local 164, the Third-Party Plaintiff, seeks

contribution from PCT, the Third-Party Defendant, on the claim of tortious interference with a

---

[12] The Court notes that the alleged factual circumstances underlying Plaintiff's secondary
boycott claim overlap with the those underlying its jurisdictional picketing claim. See Compl., ¶ 20.
Nevertheless, Defendant has construed Count One of Plaintiff's Complaint as alleging two separate
claims, namely, violation of 29 U.S.C. § 158(b)(4)(i)(B) (secondary boycott) and 29 U.S.C. §
158(b)(4)(i)(D) (jurisdictional picketing) and seeks summary judgment as to both claims.  Because
Plaintiff has failed to respond to Defendant's legal arguments regarding jurisdictional picketing, such
legal arguments are deemed as unopposed.

prospective economic advantage alleged by Plaintiff against Local 164 in the Complaint.  Thus, the theory underlying the Third-Party Complaint is that, in the event that Local 164 were to be found liable to the Plaintiff for the claim of tortious interference with a prospective economic advantage, "PCT is liable to Local 164 because PCT was the one who knew of Plaintiff's potential future contracts and intentionally interfered with those contracts when it terminated its contract with Plaintiff" for work on the Project.

Having found Plaintiff's tortious interference claims preempted by § 303 of the LMRA, the derivative claims asserted by Local 164 against PCT in the Third-Party Complaint are now moot. Local 164 concedes as much.  (Third-Party Def. Opp'n Br. at 2).  Accordingly, PCT's motion for summary judgment is granted in its entirety.

## CONCLUSION

Based on the reasons set forth above, Plaintiff's motion for partial summary judgment is granted in part and denied in part.  In particular, Plaintiff's motion is granted as to its secondary boycott claim and is denied as to its tortious interference claims.  Defendant's motion for summary judgment is granted in part and denied in part. In particular, Defendant's motion is granted as to the claims of tortious interference and jurisdictional picketing, but is denied as to the secondary boycott claim.  Finally, Third-Party Defendant's motion for summary judgment is granted in its entirety.

The parties are to appear for a conference before Magistrate Judge Mark Falk on **Thursday, May 27, 2010 at 10:00  a.m.** to discuss any outstanding issues, including the issue of damages.

Date:   May 10, 2010                              /s/ Jose L. Linares
                                                   Jose L. Linares
                                                   United States District Judge